is no substantial adverse change as a result of the COVID-19 emergency, the CDC would complete SBA Form 2101 with no changes (assuming that there has been no unremedied substantial adverse change in the Borrower's ability to repay for any other reason), and must document and retain its determination in its loan file.

2. Substantial Adverse Change. If the CDC concludes that the COVID-19 emergency is the immediate and direct cause of a substantial adverse change in the Borrower's ability to repay the 504 loan, the CDC, the Interim Lender, the Third Party Lender and the Borrower (and Operating Company, if applicable) may continue with the 504 debenture sale, provided that the CDC, the Interim Lender, the Third Party Lender, and the Borrower (and Operating Company, if applicable) execute the attached COVID-19 Substantial Adverse Change Remedy Certification and Agreement (COVID-19 Agreement), in addition to SBA Forms 2101, 2287, 2288 and 2289."

Procedural Notice 5000-20010 was issued prior to the enactment of the CARES Act. With the availability of the section 1112 payments, Lenders should already be considering as part of their No Adverse Change determination for the upcoming debenture sales whether Borrowers will have the ability to make the payments owed on the Third Party Loan during the 6-month period that SBA will be making the section 1112 payments. To make this clear, SBA is hereby revising paragraphs 1) and 2) of the Procedural Notice 5000-20010 to state:

"1. No Substantial Adverse Change. Based on the certifications by the Interim Lender and the Borrower (and Operating Company if Borrower is an EPC), and based on its own consideration, the CDC must determine for each loan before the debenture sale whether the COVID-19 emergency is the immediate and direct cause of a substantial adverse change in the Borrower's (or Operating Company's) ability to repay the Project financing since the submission of the loan application to SBA. In making this determination, the CDC must consider whether it is likely that the Borrower will have the ability, during the 6-month period that SBA will be making the monthly payments for the 504 loan under section 1112 of the CARES Act, to timely make the payments that will be owed to the Third Party Lender for the Third Party Loan financing the Borrower's 504 Project. If the CDC concludes there is no substantial adverse change as a result of the COVID-19 emergency, the CDC would complete SBA Form 2101 with no changes (assuming that there has been no unremedied substantial adverse change in the Borrower's ability to repay for any other reason), and must document and retain its determination in its loan file.

2. Substantial Adverse Change. If the CDC concludes that the COVID-19 emergency is the immediate and direct cause of a substantial adverse change in the Borrower's ability to repay the Project financing, the CDC, the Interim Lender, the Third Party Lender and the Borrower (and Operating Company, if applicable) may continue with the 504 debenture sale, provided that the CDC, the Interim Lender, the Third Party Lender, and the Borrower (and Operating Company, if applicable) execute the attached COVID-19 Substantial Adverse Change Remedy Certification and

---

**PAGE 7 of 8**  **EXPIRES: 4/1/2021**
SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete
Must be accompanied by SBA Form 58


Federal Recycling Program    Printed on Recycled Paper

Agreement (COVID-19 Agreement), in addition to SBA Forms 2101, 2287, 2288 and 2289."

D. Waiver of Statutory Limits on Maximum Loan Maturities.

Under section 1112(d)(2) of the CARES Act, SBA authorizes 7(a) Lenders to extend the loan maturities beyond the applicable statutory limits where Lenders provide a deferral and extend the maturity of the loan.

**Questions**

Questions on this Notice may be directed to the Lender Service Specialists in the local SBA Field office. The local SBA Field office may be found at https://www.sba.gov/tools/local-assistance/districtoffices.

William M. Manger
Associate Administrator Office of Capital Access

PAGE 8 of 8     EXPIRES: 4/1/2021
SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete
Must be accompanied by SBA Form 58


Federal Recycling Program    Printed on Recycled Paper

## FINANCING AND SECURITY AGREEMENT

THIS FINANCING AND SECURITY AGREEMENT (this "Agreement") is made this 10th day of August, 2018, by and between PACEM SOLUTION INTERNATIONAL LLC, a limited liability company organized under the laws of the Commonwealth of Virginia ("Borrower") and ACCESS NATIONAL BANK, a national banking association, its successors and assigns ("Lender").

### RECITALS

A. Borrower has applied to Lender for a term loan facility in the principal amount of $5,000,000 to be used by Borrower for the Permitted Uses described in this Agreement.

B. Lender is willing to make the credit facility available to Borrower upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENTS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1   Certain Defined Terms.

As used in this Agreement, the terms defined in the Preamble and Recitals hereto shall have the respective meanings specified therein, and the following terms shall have the following meanings:

"Account" individually and "Accounts" collectively mean all presently existing or hereafter acquired or created accounts, accounts receivable, health-care insurance receivables, contract rights, notes, drafts, instruments, acceptances, chattel paper, leases and writings evidencing a monetary obligation or a security interest in, or a lease of, goods, all rights to payment of a monetary obligation or other consideration under present or future contracts (including, without limitation, all rights (whether or not earned by performance) to receive payments under presently existing or hereafter acquired or created letters of credit), or by virtue of property that has been sold, leased, licensed, assigned or otherwise disposed of, services rendered or to be rendered, loans and advances made or other considerations given, by or set forth in or arising out of any present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy, instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of present or future contracts, agreements or general interest in goods which gave rise to any or all of the foregoing, including all commercial tort claims, other claims or causes of action now existing or hereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind (including, without limitation, real property mortgages and deeds

of trust) Supporting Obligations, letter-of-credit rights and letters of credit given by any Person with respect to any of the foregoing, all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to any or all of the foregoing and all equipment and general intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all Proceeds of the foregoing.

"Account Debtor" means any Person who is obligated on a Receivable and "Account Debtors" mean all Persons who are obligated on the Receivables.

"ACH Transactions" means any cash management or related services including the automatic clearing house transfer of funds by Lender for the account of Borrower pursuant to agreement or overdrafts.

"Affiliate" means, with respect to any designated Person, any other Person, (a) directly or indirectly controlling, directly or indirectly controlled by, or under direct or indirect common control with the Person designated, (b) directly or indirectly owning or holding five percent (5%) or more of any equity interest in such designated Person, or (c) five percent (5%) or more of whose stock or other equity interest is directly or indirectly owned or held by such designated Person. For purposes of this definition, the term "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or other equity interests or by contract or otherwise.

"Agreement" means this Financing and Security Agreement, as amended, restated, supplemented or otherwise modified in writing in accordance with the provisions of Section 8.2 (Amendments; Waivers).

"Asset Disposition" means the disposition of any or all of the Assets of Borrower or any of its Subsidiaries, whether by sale, lease, transfer or other disposition (including any such disposition effected by way of merger or consolidation) other than (a) sales of Inventory, (b) licensing of Patents, Trademarks and/or Copyrights, and (c) dispositions of worn, used, surplus or obsolete Equipment, but all only to the extent made in the ordinary course of business.

"Assets" means at any date all assets that, in accordance with GAAP consistently applied, should be classified as assets on a consolidated balance sheet of Borrower and its Subsidiaries.

"Assignee" means any Person to which Lender assigns all or any portion of its interests under this Agreement, any Commitment, and any Loan, in accordance with the provisions of Section 8.5 (Assignments by Lender), together with any and all successors and assigns of such Person; "Assignees" means the collective reference to all Assignees.

"Assignment of Life Insurance" means collectively (a) that certain assignment of life insurance as collateral for the benefit of Lender, which Assignment of Life Insurance assigns to Lender all of the right, title and interest of Borrower in, and to, that certain life insurance policy issued by Principal Life on the life of Cory Mills in the face amount of Five Million Dollars ($5,000,000), as amended, restated, reissued, supplemented or otherwise modified in writing at any time and from time to time and (b) that certain assignment of life insurance as collateral for

the benefit of Lender, which Assignment of Life Insurance assigns to Lender all of the right, title and interest of Borrower in, and to, that certain life insurance policy issued by Principal Life on the life of Rana AL Saadi in the face amount of Five Million Dollars ($5,000,000), as amended, restated, reissued, supplemented or otherwise modified in writing at any time and from time to time.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time, and any successor Laws.

"Benefit Arrangement" means an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or Multiemployer Plan and which is maintained or otherwise contributed to by any Borrower or any Subsidiary.

"Borrower" means the Person defined as a "Borrower" in the preamble of this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State are authorized or required to close.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Cash Equivalents" means (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit with maturities of one (1) year or less from the date of acquisition of, or money market accounts maintained with, Lender, any Affiliate of Lender, or any other domestic commercial bank having capital and surplus in excess of One Hundred Million Dollars ($100,000,000.00) or such other domestic financial institutions or domestic brokerage houses to the extent disclosed to, and approved by, Lender and (c) commercial paper of a domestic issuer rated at least either A-1 by Standard & Poor's Corporation (or its successor) or P-1 by Moody's Investors Service, Inc. (or its successor) with maturities of six (6) months or less from the date of acquisition.

"Chattel Paper" means a record or records (including, without limitation, electronic chattel paper) that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, or a lease of specific goods; all Supporting Obligations with respect thereto; any returned, rejected or repossessed goods and software covered by any such record or records and all proceeds (in any form including, without limitation, accounts, contract rights, documents, chattel paper, instruments and general intangibles) of such returned, rejected or repossessed goods; and all Proceeds of the foregoing.

"Closing Date" means the Business Day, in any event not later than August 10, 2018, on which Lender shall be satisfied that the conditions precedent set forth in Section 5.1 (Conditions to Initial Advance) have been fulfilled or otherwise waived by Lender.

"Collateral" means all property of Borrower subject from time to time to the Liens of this Agreement, any of the Security Documents and/or any of the other Financing Documents, together with any and all Proceeds thereof.

"Collateral Disclosure List" has the meaning described in Section 3.3 (Collateral Disclosure List).

"Commitment" the Term Loan Commitment, and "Commitments" means the collective reference to the Term Loan Commitment and the commitment for any loan, letter of credit, interest rate protection, foreign exchange risk, cash management, and other Credit Facility now or hereafter provided to Borrower by Lender whether under this Agreement or otherwise.

"Committed Amount" means the Term Loan Committed Amount.

"Commonly Controlled Entity" means an entity, whether or not incorporated, which is under common control with Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code.

"Copyrights" means and includes, in each case whether now existing or hereafter arising, all of Borrower's rights, title and interest in and to (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, copyright applications, and all renewals of any of the foregoing, (b) all income, royalties, damages and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, current or future infringements of any of the foregoing, (c) the right to sue for past, present and future infringements of any of the foregoing, and (d) all rights corresponding to any of the foregoing throughout the world.

"Credit Facility" means the Term Loan Facility, as the case may be, and "Credit Facilities" means collectively the Term Loan Facility and any and all other credit facilities now or hereafter extended under or secured by this Agreement.

"Deed of Trust" means that certain deed of trust dated the date hereof from the Guarantors to Robert Shoemaker and Patricia J. Fisher, trustees for the benefit of Lender, as the same may from time to time be amended, restated, supplemented or modified.

"Default" means an event which, with the giving of notice or lapse of time, or both, could or would constitute an Event of Default under the provisions of this Agreement.

"Documents" means all documents of title or receipts, whether now existing or hereafter acquired or created, and all Proceeds of the foregoing.

"Enforcement Costs" means all expenses, charges, costs and fees whatsoever (including, without limitation, reasonable attorney's fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with (a) any or all of the Obligations, this Agreement and/or any of the other Financing Documents, (b) the creation, perfection, collection, maintenance, preservation, defense, protection, realization upon, disposition, sale or enforcement of all or any part of the Collateral, this Agreement or any of the other Financing Documents, including, without limitation, those costs and expenses more specifically enumerated in Section

3.6 (Costs) and/or Section 8.10 (Enforcement Costs), and further including, without limitation, amounts paid to lessors, processors, bailees, warehousemen, sureties, judgment creditors and others in possession of or with a Lien against or claimed against the Collateral, and (c) the monitoring, administration, processing and/or servicing of any or all of the Obligations, the Financing Documents, and/or the Collateral.

"Equipment" means all equipment, machinery, computers, chattels, tools, parts, machine tools, furniture, furnishings, fixtures and supplies of every nature, presently existing or hereafter acquired or created and wherever located, whether or not the same shall be deemed to be affixed to real property, and all of such types of property leased by Borrower and all of Borrower's rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all accessions, additions, fittings, accessories, special tools, and improvements thereto and substitutions therefor and all parts and equipment which may be attached to or which are necessary or beneficial for the operation, use and/or disposition of such personal property, all licenses, warranties, franchises and General Intangibles related thereto or necessary or beneficial for the operation, use and/or disposition of the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all Proceeds of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with any Borrower would (at any relevant time within the immediate preceding six years) be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Internal Revenue Code.

"ERISA Event" means, with respect to any Borrower or an ERISA Affiliate, (a) the occurrence of any Reportable Event with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the withdrawal of any Borrower or an ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations of any Borrower or an ERISA Affiliate that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the incurrence by any Borrower or an ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (d) the incurrence by any Borrower or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (e) the institution of proceedings to terminate a Plan or Multiemployer Plan by the PBGC; (f) the failure by any Borrower or an ERISA Affiliate to make required contributions when due to a Multiemployer Plan or Plan unless such failure is cured within 30 days; (g) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard; (h) the occurrence of any event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan or the imposition of liability under Section 4069 or 4212(c) of ERISA; (i) the occurrence of a withdrawal by any Borrower or an ERISA Affiliate

from a Multiple Employer Plan; (j) the receipt by any Borrower or an ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or an ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent (within the meaning of Section 4245 of ERISA), in reorganization (within the meaning of Section 4241 of ERISA), or in "critical" status (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA); (k) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or an ERISA Affiliate or the imposition of any Lien upon any Borrower or an ERISA Affiliate in favor of the PBGC under Title IV of ERISA or Section 430 of the Internal Revenue Code; (l) a determination that a Plan is, or is reasonably expected to be, in "at risk" status (within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA); (m) the occurrence of any Prohibited Transaction which could subject any Borrower or an ERISA Affiliate to a civil penalty under Section 502(i) of ERISA or a tax under Section 4975 of the Internal Revenue Code in connection with any Plan or Benefit Arrangement; (n) the adoption of an amendment to a Plan requiring the provision of security to such Plan under Section 436 of the Internal Revenue Code; (o) the receipt by any Borrower or, solely with respect to a Plan, an ERISA Affiliate from the Internal Revenue Service of notification that any Qualified Plan failed to so qualify under Section 401(a) of the Internal Revenue Code; or (p) the failure of any Plan to meet the minimum funding standards of Sections 412 and 430 of the Internal Revenue Code or Sections 302 and 303 of ERISA.

"Event of Default" has the meaning described in Article VII (Default and Rights and Remedies).

"Facilities" means the collective reference to the loan, letter of credit, interest rate protection, foreign exchange risk, cash management, and other credit facilities now or hereafter provided to Borrower by Lender.

"Fees" means the collective reference to each fee payable to Lender under the terms of this Agreement or under the terms of any of the other Financing Documents.

"Financing Documents" means at any time collectively this Agreement, the Notes, the Security Documents, and any other instrument, agreement or document previously, simultaneously or hereafter executed and delivered by Borrower, any Guarantor and/or any other Person, singly or jointly with another Person or Persons, evidencing, securing, guarantying or in connection with this Agreement, any Note, any of the Security Documents, any of the Facilities, and/or any of the Obligations.

"Fixed or Capital Assets" of a Person at any date means all assets which would, in accordance with GAAP consistently applied, be classified on the balance sheet of such Person as property, plant or equipment at such date.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" means all general intangibles of every nature, whether presently existing or hereafter acquired or created, and without implying any limitation of the foregoing, further means all books and records, commercial tort claims, other claims (including without limitation all claims for income tax and other refunds), payment intangibles, Supporting Obligations, choses in action, claims, causes of action in tort or equity, contract rights, judgments, customer lists, software, Patents, Trademarks, licensing agreements, rights in intellectual property, goodwill (including goodwill of Borrower's business symbolized by and associated with any and all Trademarks, trademark licenses, Copyrights and/or service marks), royalty payments, licenses, letter-of-credit rights, letters of credit, contractual rights, the right to receive refunds of unearned insurance premiums, rights as lessee under any lease of real or personal property, literary rights, Copyrights, service names, service marks, logos, trade secrets, amounts received as an award in or settlement of a suit in damages, deposit accounts, interests in joint ventures, general or limited partnerships, or limited liability companies or partnerships, rights in applications for any of the foregoing, books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to any or all of the foregoing, all Supporting Obligations with respect to any of the foregoing, and all Equipment and General Intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all Proceeds of the foregoing.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any department, agency or instrumentality thereof.

"Guarantor" means Rana AL Saadi or Cory Mills, as the case may be and "Guarantors" means collectively Rana AL Saadi and Cory Mills.

"Guaranty" means that certain Guaranty of Payment Agreement of even date herewith from the Guarantors in favor of the Lender.

"Hazardous Materials" means (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and regulations promulgated thereunder; (c) any substance the presence of which on any property now or hereafter owned, acquired or operated by Borrower is prohibited by any Law similar to those set forth in this definition; and (d) any other substance which by Law requires special handling in its collection, storage, treatment or disposal.

"Hazardous Materials Contamination" means the contamination (whether presently existing or occurring after the date of this Agreement) by Hazardous Materials of any property owned, operated or controlled by Borrower or for which Borrower has responsibility, including, without limitation, improvements, facilities, soil, ground water, air or other elements on, or of, any property now or hereafter owned, acquired or operated by Borrower, and any other contamination by Hazardous Materials for which Borrower is, or is claimed to be, responsible.

"Indebtedness" of a Person means at any date the total liabilities of such Person at such time determined in accordance with GAAP consistently applied.

"Indebtedness for Borrowed Money" of a Person means at any time the sum at such time of (a) Indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (b) any obligations of such Person in respect of letters of credit, banker's or other acceptances or similar obligations issued or created for the account of such Person, (c) Lease Obligations of such Person with respect to Capital Leases, (d) all liabilities secured by any Lien on any property owned by such Person, to the extent attached to such Person's interest in such property, even though such Person has not assumed or become personally liable for the payment thereof, (e) obligations of third parties which are being guarantied or indemnified against by such Person or which are secured by the property of such Person; (f) any obligation of such Person under an employee stock ownership plan or other similar employee benefit plan; (g) any obligation of such Person or a Commonly Controlled Entity to a Multi-employer Plan; and (h) any obligations, liabilities or indebtedness, contingent or otherwise, under or in connection with, any Swap Contract; but excluding trade and other accounts payable in the ordinary course of business in accordance with customary trade terms and which are not overdue (as determined in accordance with customary trade practices) or which are being disputed in good faith by such Person and for which adequate reserves are being provided on the books of such Person in accordance with GAAP.

"Indemnified Parties" has the meaning set forth in Section 8.19 (Indemnification).

"Instrument" means a negotiable instrument or any other writing which evidences a right to payment of a monetary obligation and is not itself a security agreement or lease and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, and all Supporting Obligations with respect to any of the foregoing and all Proceeds with respect to any of the foregoing.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Income Tax Regulations issued and proposed to be issued thereunder.

"Inventory" means all goods of Borrower and all right, title and interest of Borrower in and to all of its now owned and hereafter acquired goods and other personal property furnished under any contract of service or intended for sale or lease, including, without limitation, all raw materials, work-in-process, finished goods and materials and supplies of any kind, nature or description which are used or consumed in Borrower's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods and other personal property and all licenses, warranties, franchises, General Intangibles, personal property and all documents of title or documents relating to the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all Proceeds of the foregoing.

"Investment Company Act" means the Investment Company Act of 1940, as the same is from time to time in effect together with any rules and regulations promulgated thereunder, and all official rulings and interpretations thereunder or thereof.

"Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract or commodity account and all Proceeds of, and Supporting Obligations with respect to, the foregoing.

"Item of Payment" means each check, draft, cash, money, instrument, item, and other remittance in payment or on account of payment of the Receivables or otherwise with respect to any Collateral, including, without limitation, cash proceeds of any returned, rejected or repossessed goods, the sale or lease of which gave rise to a Receivable, and other proceeds of Collateral; and "Items of Payment" means the collective reference to all of the foregoing.

"Laws" means all ordinances, statutes, rules, regulations, orders, injunctions, writs, or decrees of any Governmental Authority.

"Lease Obligations" of a Person means for any period the rental commitments of such Person for such period under leases for real and/or personal property (net of rent from subleases thereof, but including taxes, insurance, maintenance and similar expenses which such Person, as the lessee, is obligated to pay under the terms of said leases, except to the extent that such taxes, insurance, maintenance and similar expenses are payable by sublessees), including rental commitments under Capital Leases.

"Letter-of-credit right" means a right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"Liabilities" means at any date all liabilities that in accordance with GAAP consistently applied should be classified as liabilities on a consolidated balance sheet of Borrower and its Subsidiaries.

"Lien" means any mortgage, deed of trust, deed to secure debt, grant, pledge, security interest, assignment, encumbrance, judgment, lien, financing statement, hypothecation, provision in any instrument or other document for confession of judgment, cognovit or other similar right or other remedy, claim, charge, control over or interest of any kind in real or personal property securing any indebtedness, duties, obligations, and liabilities owed to, or claimed to be owed to, a Person, all whether perfected or unperfected, avoidable or unavoidable, based on the common law, statute or contract or otherwise, including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction, excluding the precautionary filing of any financing statement by any lessor in a true lease transaction, by any bailor in a true bailment transaction or by any consignor in a true consignment transaction under the Uniform Commercial Code of any jurisdiction or the agreement to give any financing statement by any lessee in a true lease transaction, by any bailee in a true bailment transaction or by any consignee in a true consignment transaction.

9

"Loan" means each of the Revolving Loan or the Term Loan, as the case may be, and "Loans" means the collective reference to the Revolving Loan and the Term Loan.

"Margin Stock" has the meaning given such term under Regulation U.

"Maximum Rate" has the meaning described in Section 2.2.4 (Maximum Interest Rate).

"Multi-employer Plan" means a Plan that is a Multi-employer plan as defined in Section 4001(a)(3) of ERISA.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (at least one of which is any Borrower or an ERISA Affiliate) at least two of whom are not under common control, as described in Sections 4063 and 4064 of ERISA.

"Note" means the Revolving Credit Note or the Term Note, as the case may be, and "Notes" means collectively the Revolving Credit Note and the Term Note, and any other promissory note which may from time to time evidence all or any portion of the Obligations.

"Obligations" means all present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of Borrower to Lender under, arising pursuant to, in connection with and/or on account of the provisions of this Agreement, each Note, each Security Document, and/or any of the other Financing Documents, the Loans, any Swap Contract and/or any of the Facilities including, without limitation, the principal of, and interest on, each Note, late charges, the Fees, Enforcement Costs, and prepayment fees (if any), letter of credit reimbursement obligations, letter of credit fees or fees charged with respect to any guaranty of any letter of credit; also means all other present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of Borrower to Lender or its Affiliates of any nature whatsoever, regardless of whether such indebtedness, duties, obligations, and liabilities be direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent; and also means any and all renewals, extensions, substitutions, amendments, restatements and rearrangements of any such indebtedness, duties, obligations, and liabilities.

"Patents" means and includes, in each case whether now existing or hereafter arising, all of Borrower's rights, title and interest in and to (a) any and all patents and patent applications, (b) any and all inventions and improvements described and claimed in such patents and patent applications, (c) reissues, divisions, continuations, renewals, extensions and continuations-in-part of any patents and patent applications, (d) income, royalties, damages, claims and payments now or hereafter due and/or payable under and with respect to any patents or patent applications, including, without limitation, damages and payments for past and future infringements, (e) rights to sue for past, present and future infringements of patents, and (f) all rights corresponding to any of the foregoing throughout the world.

"PBGC" means the Pension Benefit Guaranty Corporation and any successor agency.

"Permitted Liens" means: (a) Liens for Taxes which are not delinquent or which Lender has determined in the exercise of its sole and absolute discretion (i) are being diligently contested in good faith and by appropriate proceedings, and such contest operates to suspend collection of

10

the contested Taxes and enforcement of a Lien, (ii) Borrower has the financial ability to pay, with all penalties and interest, at all times without materially and adversely affecting Borrower, and (iii) are not, and will not be with appropriate filing, the giving of notice and/or the passage of time, entitled to priority over any Lien of Lender; (b) deposits or pledges to secure obligations under workers' compensation, social security or similar laws, or under unemployment insurance in the ordinary course of business; (c) Liens securing the Obligations; (d) judgment Liens to the extent the entry of such judgment does not constitute a Default or an Event of Default under the terms of this Agreement or result in the sale or levy of, or execution on, any of the Collateral; and (e) such other Liens, if any, as are set forth on Schedule 4.1.19 attached hereto and made a part hereof.

"Permitted Uses" means, to establish its munitions facility in Perry, Florida, including the costs of build out and equipment for such facility, and to provide permanent working capital.

"Person" means and includes an individual, a corporation, a partnership, a joint venture, a limited liability company or partnership, a trust, an unincorporated association, a Governmental Authority, or any other organization or entity.

"Plan" means any pension plan that is covered by Title IV of ERISA and in respect of which Borrower or a Commonly Controlled Entity is an "employer" as defined in Section 3 of ERISA.

"Post-Default Rate" means the highest interest rate in effect from time to time, under the Notes plus five percent (5.0%) per annum.

"Prime Rate" means the rate of interest publicly announced from time to time by Lender as its prime rate. It is a rate set by Lender based upon various factors including Lender's costs and desired return, general economic conditions, and other factors, and is used as a reference point for pricing some loans. However, Lender may price loans at, above, or below such announced rate. Any changes in the Prime Rate shall take effect on the day specified in the public announcement of such change.

"Proceeds" has the meaning described in the Uniform Commercial Code as in effect from time to time.

"Prohibited Transaction" means any prohibited transaction within the meaning of Section 4975 of the Internal Revenue Code or Section 406 of ERISA for which neither an individual nor a class exemption has been issued by the United States Department of Labor.

"Qualified Plan" means a Benefit Arrangement that is intended to be tax-qualified under Section 401(a) of the Internal Revenue Code.

"Receivable" means one of Borrower's now owned and hereafter owned, acquired or created Accounts, Chattel Paper, General Intangibles and Instruments; and "Receivables" means all of Borrower's now or hereafter owned, acquired or created Accounts, Chattel Paper, General Intangibles and Instruments, and all Proceeds thereof.

"Registered Organization" means an organization organized solely under the law of a single state or the United States and as to which the state or the United States must maintain a public record showing the organization to have been organized.

"Regulation U" means Regulation U (12 CFR Part 221) of the Board of Governors of the Federal Reserve System, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder.

"Responsible Officer" means the chief executive officer of Borrower or the president of Borrower or, with respect to financial matters, the chief financial officer of Borrower.

"Sanctioned Country" means a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx, or as otherwise published from time to time.

"Sanctioned Person" means (a) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, or (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, or (iii) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Security Documents" means collectively the Deed of Trust and any assignment, pledge agreement, security agreement, mortgage, deed of trust, deed to secure debt, financing statement and any similar instrument, document or agreement under or pursuant to which a Lien is now or hereafter granted to, or for the benefit of, Lender on any real or personal property of any Person to secure all or any portion of the Obligations, all as the same may from time to time be amended, restated, supplemented or otherwise modified.

"State" means the Commonwealth of Virginia.

"Subordinated Indebtedness" means all Indebtedness, incurred at any time by Borrower, which is in amounts, subject to repayment terms, and subordinated to the Obligations, as set forth in one or more written agreements, all in form and substance satisfactory to Lender in its sole and absolute discretion.

"Subsidiary" means any corporation the majority of the voting shares of which at the time are owned directly by Borrower and/or by one or more Subsidiaries of Borrower.

"Supporting Obligation" means a letter-of-credit right, secondary obligation or obligation of a secondary obligor or that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument or investment property.

"Swap Contract" means any document, instrument or agreement between Borrower and Lender or any affiliate of Lender, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time.

"Taxes" means all taxes and assessments whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all penalties or interest thereon), which at any time may be assessed, levied, confirmed or imposed by any Governmental Authority on Borrower or any of its properties or assets or any part thereof or in respect of any of its franchises, businesses, income or profits.

"Term Loan" has the meaning described in Section 2.1.1 (Term Loan Commitment).

"Term Loan Commitment" has the meaning described in Section 2.1.1 (Term Loan Commitment).

"Term Loan Committed Amount" has the meaning described in Section 2.1.1 (Term Loan Commitment).

"Term Loan Facility" means the facility established by Lender pursuant to Section 2.1 (Term Loan Facility).

"Term Loan Optional Prepayment" and "Term Loan Optional Prepayments" have the meanings described in Section 2.1.3 (Optional Prepayments of Term Loan).

"Term Note" has the meaning described in Section 2.1.2 (The Term Note).

"Trading with the Enemy Act" means the Trading with the Enemy Act of the United States (50 U.S.C. App. §§ 1 et seq.), as the same is from time to time in effect together with any rules and regulations promulgated thereunder, and all official rulings and interpretations thereunder or thereof.

"Uniform Commercial Code" means, unless otherwise provided in this Agreement, the Uniform Commercial Code as adopted by and in effect from time to time in the State or in any other jurisdiction, as applicable.

"Wholly Owned Subsidiary" means any domestic United States corporation, all the shares of stock of all classes of which (other than directors' qualifying shares) at the time are owned directly or indirectly by Borrower and/or by one or more Wholly Owned Subsidiaries of Borrower.

"Withdrawal Liability" means any liability as a result of a complete or partial withdrawal from a Multiemployer Plan as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2    Accounting Terms and Other Definitional Provisions.

Unless otherwise defined herein, as used in this Agreement and in any certificate, report or other document made or delivered pursuant hereto, accounting terms not otherwise defined herein, and accounting terms only partly defined herein, to the extent not defined, shall have the respective meanings given to them under GAAP, as consistently applied to the applicable Person.  All terms used herein which are defined by the Uniform Commercial Code shall have the same meanings as assigned to them by the Uniform Commercial Code unless and to the extent varied by this Agreement.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are references to articles, sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified.  As used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require.  Reference to any one or more of the Financing Documents shall mean the same as the foregoing may from time to time be amended, restated, substituted, extended, renewed, supplemented or otherwise modified.

## ARTICLE II
## THE CREDIT FACILITIES

Section 2.1    The Term Loan Facility.

2.1.1    Term Loan Commitment.

Subject to and upon the provisions of this Agreement, Lender agrees to make a loan (the "Term Loan") to Borrower on the Closing Date in the principal amount of Five Million Dollars ($5,000,000) (herein called the "Term Loan Committed Amount").  The obligation of Lender to make the Term Loan is herein called its "Term Loan Commitment".

2.1.2    The Term Note.

The obligation of Borrower to pay the Term Loan with interest shall be evidenced by a promissory note (as from time to time extended, amended, restated, supplemented or otherwise modified, the "Term Note") substantially in the form of EXHIBIT A attached hereto and made a part hereof with appropriate insertions.

2.1.3    Optional Prepayments of Term Loan.

Borrower shall have the option, at any time and from time to time, to prepay (each a "Term Loan Optional Prepayment" and collectively the "Term Loan Optional Prepayments") the Term Loan, in whole or in part, upon twenty-one (21) days prior written notice, specifying the date and amount of prepayment.  The amount to be so prepaid, together with interest accrued thereon to date of prepayment if the amount is intended as a prepayment of the Term Loan in whole, shall be paid by Borrower to Lender on the date specified for such prepayment.  Partial Term Loan Optional Prepayments shall be in an amount not less than the amount of the next principal installment under the Term Note and shall be applied first to all accrued and unpaid

interest on the principal of the Term Note, then to the balloon payment due at maturity and then to principal against the principal installments in the inverse order of their maturity.

Section 2.2 General Financing Provisions.

2.2.1 Borrower's Representatives.

Lender is hereby irrevocably authorized by Borrower to make advances under the Loans to Borrower pursuant to the provisions of this Agreement upon the written, oral or telephone request of any one or more of the Persons who is from time to time a Responsible Officer of Borrower under the provisions of the most recent certificate of corporate resolutions and/or incumbency of Borrower on file with Lender.

Lender assumes no responsibility or liability for any errors, mistakes, and/or discrepancies in the oral, telephonic, written or other transmissions of any instructions, orders, requests and confirmations between Lender and Borrower in connection with the Credit Facilities, any Loan, or any other transaction in connection with the provisions of this Agreement.

2.2.2 Use of Proceeds of the Loans.

The proceeds of each advance under the Loans shall be used by Borrower for Permitted Uses, and for no other purposes except as may otherwise be agreed by Lender in writing. Borrower shall use the proceeds of the Loans promptly.

2.2.3 Computation of Interest and Fees.

All applicable Fees and interest shall be calculated on the basis of a year of 360 days for the actual number of days elapsed. Any change in the interest rate on any of the Obligations resulting from a change in the Prime Rate shall become effective as of the opening of business on the day on which such change in the Prime Rate is announced.

2.2.4 Maximum Interest Rate.

In no event shall any interest rate provided for hereunder exceed the maximum rate permissible for corporate borrowers under applicable law for loans of the type provided for hereunder (the "Maximum Rate"). If, in any month, any interest rate, absent such limitation, would have exceeded the Maximum Rate, then the interest rate for that month shall be the Maximum Rate, and, if in future months, that interest rate would otherwise be less than the Maximum Rate, then that interest rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this Section, have been paid or accrued if the interest rates otherwise set forth in this Agreement had at all times been in effect, then Borrower shall, to the extent permitted by applicable law, pay Lender, an amount equal to the excess of (a) the lesser of (i) the amount of interest which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of interest which would have

15

accrued had the interest rates otherwise set forth in this Agreement, at all times, been in effect over (b) the amount of interest actually paid or accrued under this Agreement. In the event that a court determines that Lender has received interest and other charges hereunder in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations other than interest, in the inverse order of maturity, and if there are no Obligations outstanding, Lender shall refund to Borrower such excess.

### 2.2.5 Payments.

All payments of the Obligations, including, without limitation, principal, interest, Prepayments, and Fees, shall be paid by Borrower without setoff, recoupment or counterclaim to Lender in immediately available funds not later than 12:00 p.m. (Eastern Time) on the due date of such payment. All payments received by Lender after such time shall be deemed to have been received by Lender for purposes of computing interest and Fees and otherwise as of the next Business Day. Payments shall not be considered received by Lender until such payments are paid to Lender in immediately available funds to Lender's principal office in Reston, Virginia or at such other location as Lender may at any time and from time to time notify Borrower. Alternatively, at its sole discretion, Lender may charge any deposit account of Borrower at Lender or any Affiliate of Lender with all or any part of any amount due to Lender under this Agreement or any of the other Financing Documents to the extent that Borrower shall have not otherwise tendered payment to Lender.

### 2.2.6 Liens; Setoff.

Borrower hereby grants to Lender as additional collateral and security for all of the Obligations, a continuing Lien on any and all monies, Investment Property, and other property of Borrower and any and all proceeds thereof, now or hereafter held or received by or in transit to, Lender, and/or any Affiliate of Lender, from or for the account of, Borrower, and also upon any and all deposit accounts (general or special) and credits of Borrower, if any, with Lender or any Affiliate of Lender, at any time existing, excluding any deposit accounts held by Borrower in its capacity as trustee for Persons who are not Affiliates of Borrower. Without implying any limitation on any other rights Lender may have under the Financing Documents or applicable Laws, during the continuance of an Event of Default, Lender is hereby authorized by Borrower at any time and from time to time, without notice to, or consent of, Borrower, to set off, appropriate, seize, freeze and apply any or all items hereinabove referred to against all Obligations then outstanding (whether or not then due), all in such order and manner as shall be determined by Lender in its sole and absolute discretion.

### 2.2.7 Requirements of Law.

In the event that Lender shall have determined in good faith that (a) the adoption of any Capital Adequacy Regulation, or (b) any change in any Capital Adequacy Regulation or in the interpretation or application thereof or (c) compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or Governmental Authority, does or shall have the effect of reducing the rate of return on the capital of Lender or any corporation controlling Lender, as a consequence of the obligations of Lender hereunder to a level below that which

Lender or any corporation controlling Lender would have achieved but for such adoption, change or compliance (taking into consideration the policies of Lender and the corporation controlling Lender, with respect to capital adequacy) by an amount deemed by Lender, in its discretion, to be material, then from time to time, after submission by Lender to Borrower of a written request therefor and a statement of the basis for Lender's determination, Borrower shall pay to Lender ON DEMAND such additional amount or amounts in order to compensate Lender or its controlling corporation for any such reduction.

### 2.2.8   ACH Transactions and Swap Contracts.

Borrower may request and Lender or its Affiliates may, in their sole and absolute discretion, provide ACH Transactions and Swap Contracts. In the event Borrower requests Lender or its Affiliates to procure ACH Transactions or Swap Contracts, then Borrower agrees to indemnify and hold Lender or its Affiliates harmless from any and all obligations now or hereafter owing to Lender or its Affiliates. Borrower agrees to pay Lender or its Affiliates all amounts owing to Lender or its Affiliates pursuant to ACH Transactions and Swap Contracts. In the event Borrower shall not have paid to Lender or its Affiliates such amounts, Lender may cover such amounts by an advance under the Revolving Loan, which advance shall be deemed to have been requested by Borrower. Borrower acknowledges and agrees that the obtaining of ACH Transactions and Swap Contracts from Lender or its Affiliates (a) is in the sole and absolute discretion of Lender or its Affiliates and (b) is subject to all rules and regulations of Lender or its Affiliates.

## ARTICLE III
## THE COLLATERAL

### Section 3.1   Debt and Obligations Secured.

All property and Liens assigned, pledged or otherwise granted under or in connection with this Agreement (including, without limitation, those under Section 3.2 (Grant of Liens)) or any of the Financing Documents shall secure (a) the payment of all of the Obligations and (b) the performance, compliance with and observance by Borrower of the provisions of this Agreement and all of the other Financing Documents or otherwise under the Obligations.

### Section 3.2   Grant of Liens.

Borrower hereby assigns, pledges and grants to Lender, and agrees that Lender shall have a perfected and continuing security interest in, and Lien on, (a) all of Borrower's Accounts, Inventory, Chattel Paper, Documents, Instruments, Equipment, Investment Property, and General Intangibles and all of Borrower's deposit accounts with any financial institution with which Borrower maintains deposits, whether now owned or existing or hereafter acquired or arising, (b) all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to an Account or Chattel Paper, (c) all insurance policies relating to the foregoing and the right to receive refunds of unearned insurance premiums under those policies, (d) all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to the foregoing and all Equipment and General Intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records; and (e) all Proceeds and

products of the foregoing. Borrower further agrees that Lender shall have in respect thereof all of the rights and remedies of a secured party under the Uniform Commercial Code as well as those provided in this Agreement, under each of the other Financing Documents and under applicable Laws.

### Section 3.3   Collateral Disclosure List.

On or prior to the Closing Date, Borrower shall deliver to Lender a list (the "Collateral Disclosure List") which shall contain such information with respect to Borrower's business and real and personal property as Lender may require and shall be certified by a Responsible Officer of Borrower, all in the form provided to Borrower by Lender. Promptly after demand by Lender, Borrower shall furnish to Lender an update of the information contained in the Collateral Disclosure List at any time and from time to time as may be requested by Lender.

### Section 3.4   Personal Property.

Borrower acknowledges and agrees that it is the intention of the parties to this Agreement that Lender shall have a first priority, perfected Lien, in form and substance satisfactory to Lender and its counsel, on all of Borrower's assets of any kind and nature whatsoever, whether now owned or hereafter acquired, subject only to the Permitted Liens, if any. In furtherance of the foregoing:

#### 3.4.1   Investment Property, Chattel Paper, Promissory Notes, etc.

(a)   On the Closing Date and without implying any limitation on the scope of Section 3.2 (Grant of Liens), Borrower shall deliver to Lender the originals of all of its letters of credit, Investment Property, Chattel Paper, Documents and Instruments and, if Lender so requires, shall execute and deliver separate pledge, assignment and security agreements in form and content acceptable to Lender, which pledge, assignment and security agreements shall assign, pledge and grant a Lien to Lender on all letters of credit, Investment Property, Chattel Paper, Documents, and Instruments.

(b)   In the event that Borrower shall acquire after the Closing Date any letters of credit, Investment Property, Chattel Paper, Documents, or Instruments, Borrower shall promptly so notify Lender and deliver the originals of all of the foregoing to Lender promptly and in any event within ten (10) days of each acquisition.

(c)   All letters of credit, Investment Property, Chattel Paper, Documents and Instruments shall be delivered to Lender endorsed and/or assigned as required by any pledge, assignment and security agreement and/or as Lender may require and, if applicable, shall be accompanied by blank irrevocable and unconditional stock or bond powers and/or notices as Lender may require.

### Section 3.5   Record Searches.

As of the Closing Date and thereafter at the time any Financing Document is executed and delivered by Borrower pursuant to this Section, Lender shall have received, in form and substance satisfactory to Lender, such Lien or record searches with respect to Borrower and/or